**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

—————————————————————————
|  )
KENITHIA ALSTON,  )
Individually and as Special Administrator of  )
the Estate of Mr. Marqueese Alston  )
    3112 Gideon Court  )
    Waldorf, MD 20602  )
                                           )    Civil Action No. _____
        Plaintiff  )
                                           )
    v.  )
                                         )
DISTRICT OF COLUMBIA,  )    **JURY TRIAL DEMANDED**
AND  )
Officers X, Y, A, and Z  )
                                         )
In their individual and official capacities  )
                                         )
Serve: Mayor Muriel Bowser  )
1350 Pennsylvania Ave. NW  )
Washington, DC 20004  )
                                         )
Serve: Attorney Karl Racine  )
441 4th Street NW  )
Suite 1100 South  )
Washington, D.C. 20001  )
                                         )
        Defendants.  )
—————————————————————————

**COMPLAINT**

On June 12, 2018, D.C. Metropolitan Police Department ("MPD") officers, without good cause or any valid basis, approached Marqueese Alston, a twenty-two-year-old Black man, chased him into an alley, and shot him twelve to eighteen times, killing him in broad daylight. They then left his lifeless body lying in the alley for hours before hauling him across the pavement by his hands and feet, placing him next to a gun they claim had been in his possession when they killed him. Marqueese's mother, Kenithia Alston, saw that her son had been killed on the evening news

1

before she was contacted by police. MPD officers did not notify her until the next day. It has now been two years and, to this day, MPD has refused to give his mother or the public a good explanation as to why they chased Marqueese into an alley and shot him dead.

Marqueese was a loving father, a beloved son, and an active member of his Ward 8 community. At the time of the shooting, Marqueese posed no threat to the officers or to the public, nor was he engaged in criminal activity.  MPD has changed its story at least three times as to what occurred on June 12, it has publicly denigrated and dehumanized Marqueese, and it has refused to publicly release camera footage of the shooting or any evidence from what it claims is an internal investigation that has now gone on for two years with no apparent findings or conclusions. The only body-worn camera ("BWC") footage MPD briefly permitted Ms. Alston to view, while under the watch of a police officer inside a police station, is a pre-edited and shortened version, including only the brief moments when her son was shot and killed. Ms. Alston has since attempted unsuccessfully to obtain access to the full footage of Marqueese's shooting through a Freedom of Information Act ("FOIA") request, among other advocacy efforts. This left Ms. Alston with neither answers nor clarity. MPD continues to evade release of the full, unredacted video, and continues to hide behind the auspices of a two-year long ongoing investigation.

As the special administrator of Mr. Alston's estate, Plaintiff Kenithia Alston brings this action on behalf of her deceased son pursuant to 42 U.S.C. § 1983 for damages and relief against the District of Columbia and against unnamed officers in their individual capacities. Additionally, on her son's behalf, Plaintiff brings against the Defendants claims of: negligent supervision and retention; negligent training; negligent actions leading to and subsequent to Marqueese's shooting; assault and battery; intentional infliction of emotional distress; and negligent infliction of emotional distress.

On her own behalf, Ms. Alston brings claims against MPD's officers in their individual and official capacities for intentional infliction of emotional distress. Her tireless advocacy for justice as well as the traumatizing interactions with MPD have been emotionally devastating. In seeking the truth, Ms. Alston continues to relive her son's death.

## JURISDICTION

The Court has subject matter jurisdiction of this case under 28 U.S.C. § 1331 federal question jurisdiction because Plaintiff brings this action under 42 U.S.C. § 1983 to vindicate rights guaranteed by the Constitution of the United States. The Court has supplemental jurisdiction to adjudicate Plaintiff's claims arising under the laws of the District of Columbia pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

## VENUE

Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) because Defendants reside in this judicial district and because the events giving rise to the Plaintiff's claims took place in this district.

## PARTIES

### Plaintiff

1. Marqueese Alston (hereinafter "Mr. Alston") was a twenty-two-year-old Black man who lived in the District of Columbia. He was the father of an infant daughter and an active member of his community. Mr. Alston served as an assistant to the youth football league and was civically engaged in his community.

2. Mr. Alston had a reputation as a dedicated worker, having held multiple jobs while completing his GED. Before MPD officers killed him, Mr. Alston was actively seeking employment to better support his daughter.

3.   Throughout his childhood, Mr. Alston was inquisitive, intelligent, and extremely devoted to his family and active in his church. Mr. Alston was a devoted father and caretaker to his daughter Lyric, who was two years old at the time of his death. Prior to Mr. Alston's death, he provided full-time care for his daughter.

4.   Kenithia Alston (hereinafter "Ms. Alston") is the mother of Marqueese Alston and the Special Administrator of his estate. Ms. Alston is forty-one years old and lives in Waldorf, Maryland.

5.   Ms. Alston has been engaged in advocacy at the local government level to obtain answers from MPD and to gain access to the BWC footage of the officers who shot and killed her son. She also filed a FOIA request for the footage.

6.   MPD has denied Ms. Alston, her family, and her legal representatives full access to the footage. Neither the District nor MPD have released any information pertaining to her son's death since June 2018, including the names of the officers who shot and killed Mr. Alston.

7.   On November 30, 2018, Ms. Alston issued formal notice to D.C. Mayor Muriel Bowser that she would be pursuing claims on behalf of her son's death pursuant to D.C. Code, Section 12-309.  Ms. Alston again notified D.C. Mayor Bowser on April 15, 2020 to restate her intention of filing a claim against the District on behalf of her son's estate.

**Defendants**

8.   The District of Columbia ("the District"), as a municipality, operates, manages, directs, and controls MPD and District of Columbia Fire and Emergency Medical Service Department ("FEMS"). MPD employs the unnamed officers who fatally shot Mr. Alston (hereinafter

"Officers X and Y") and the unnamed officers with supervisory authority over Officers X and Y (hereinafter "Officers Z and A").[1]

9.   Upon information and belief, Officers X, Y, Z, and A are and were at all times relevant to this Complaint employed by MPD in Washington, DC. They are sued in their individual capacities.

10.  At all times relevant to this Complaint, all Defendants acted under color of District of Columbia law.

## FACTUAL ALLEGATIONS

### June 12, 2018 Shooting

11.  On June 12, 2018, Officers X and Y brutally killed Mr. Alston by shooting him twelve to eighteen times.

12.  Prior to the shooting, Mr. Alston was speaking with acquaintances on the 3700 block of First Street Southeast, a small, residential neighborhood in Ward 8 of the District of Columbia. Officers X and Y approached the group for no good cause.

13.  Originally, MPD gave no explanation as to why the officers approached Mr. Alston. Days after the shooting, MPD claimed that Officers X and Y approached Mr. Alston's group on suspicion that the men carried illegal firearms.

14.  A month prior, MPD Chief Peter Newsham issued an order demanding an increase of MPD personnel in Ward 8. Officers X and Y were in Ward 8 on June 12 pursuant to that order.

---

[1]  In using "Officers Z and A" as a placeholder, Plaintiff does not allege that only two supervisory officers are relevant to her claims. Plaintiff does not know how many supervisory officers are potentially liable to her; she uses the placeholder only to suggest the possibility that multiple supervisory officers are relevant to this Complaint.

15. After the officers approached, Mr. Alston fled. Officers X and Y gave chase. Upon information and belief, Officers X and Y failed to identify themselves as police officers or otherwise speak with Mr. Alston before chasing him.

16. After running for a period of time, Mr. Alston started to stop and turned to face Defendant Officers. Mr. Alston then turned forward. Officers X and Y shot him between twelve and eighteen times.

17. FEMS medical responders did not arrive until approximately an hour after Mr. Alston was shot. Upon arriving, they pronounced Mr. Alston dead.

18. Officers left Mr. Alston's body on the scene for several hours. During that time, approximately two dozen officers arrived and pushed back crowds of onlookers.

19. Nearly two years after his death, MPD has not revealed key details of Mr. Alston's shooting, including how long or why Mr. Alston was chased by Defendant Officers, whether he complied with any of their orders, or if Officers X and Y spoke at all with Mr. Alston before summarily ending his life. The autopsy report likewise provides few answers to why the police officers summarily ended Mr. Alston's life.

20. MPD has repeatedly refused to release information regarding Mr. Alston's killing on the grounds that it is conducting an ongoing investigation. After nearly two years, MPD continues to evade releasing information about Mr. Alston's death by maintaining the pretext of an ongoing investigation. To this day, MPD has failed to provide a timeframe for the investigation.

21. Any findings resulting from the police investigation, if they exist, have not been made public.

**Aftermath of the Shooting**

22. Following the shooting, MPD changed its account to the public multiple times regarding the circumstances leading to, and including, Mr. Alston's shooting.

23. MPD has never fully explained why the officers initially approached Mr. Alston, why they chased him, or why they specifically targeted Mr. Alston among the others he was with on June 12. Rather, MPD has dismissed Ms. Alston's concerns as a product of the community's general distrust of the police department. To MPD, Mr. Alston was nothing more than another Black kid on the streets of Ward 8.

24. When the MPD representatives finally came to Ms. Alston's home the day following the shooting, the representatives told Ms. Alston that they were there regarding an incident that had occurred the day before. The MPD representatives then asked Ms. Alston if she had any questions, handed her a printout from Google with the DC medical examiner's contact information and a business card of a sergeant in internal affairs, and apathetically offered an "I extend my condolences." Throughout this interaction, MPD never told Ms. Alston that her son Mr. Alston had been killed by MPD Officers.

25. In its first reported statements on June 12, 2018, the night of the shooting, MPD alleged that the pursuit began when Mr. Alston started running after they approached him in an alley. According to their initial statement, at some point during the chase Mr. Alston reached toward his waistband and brandished a gun before Officers X and Y shot him.

26. In later statements—starting on June 13, 2018—MPD and Chief Newsham changed their account of the shooting. They claimed that Mr. Alston fired at the officers first before being shot and that Officers X and Y shot Mr. Alston in self-defense. Chief Newsham also alleged

on June 13 that Officers X and Y only approached Mr. Alston after first seeing him reach toward his waistband.

27. On June 13, 2018, MPD posted a statement about Mr. Alston's shooting on its website that included a photograph of a semiautomatic gun officers allegedly recovered from the scene alongside an extended magazine and ammunition. The picture shows the gun in shrubbery; Mr. Alston died in a paved alley.

28. In video footage captured on the evening of the shooting, various as of yet unidentified officers can be seen moving Mr. Alston's body toward nearby shrubbery.

29. Multiple witnesses on the scene at the time of the shooting dispute MPD's characterization, denying ever seeing Mr. Alston with a gun or hearing any crossfire.

30. One eyewitness, cited in news reports, stated that Mr. Alston was leaving his front porch and walking across the street before Officers X and Y suddenly chased him and opened fire. According to this witness, it would have been out of character for Mr. Alston, a supportive father and active member of his community, to possess and brandish a firearm.

31. Other witnesses within earshot confirmed on social media and to news organizations that there was no crossfire. There are no known witness accounts that confirm the narrative MPD ultimately settled on.

32. Officers X and Y were placed on administrative leave after killing Mr. Alston. MPD is allegedly still investigating the shooting. It is unclear whether Officers X and Y will or already have returned to work. Upon information and belief, no officers have faced official discipline for their role in Mr. Alston's death.

**Plaintiff's Efforts to View Body-Worn Camera Footage**

33. At all relevant times, Officers X and Y wore activated body worn cameras ("BWCs") that captured their encounter with and shooting of Mr. Alston.

34. MPD exacerbated Ms. Alston's pain and grief by refusing to allow her to view the footage of the shooting. This has left her without any factual details of or explanation for her son's death for nearly two years.

35. When Ms. Alston first attempted to secure access to the BWC footage from Mr. Alston's shooting, MPD replied that, because Mr. Alston was not a minor, *only* Mr. Alston—who had been killed—had a right to view the footage.

36. Following public outcry on social media and in the press, counsel for Ms. Alston negotiated an agreement with Attorney General Karl Racine on Ms. Alston's behalf, and Ms. Alston was finally allowed to view a five-minute, pre-edited and manipulated version of the BWC footage in August 2019. MPD only allowed Ms. Alston to view the footage once. Mr. Alston's father-figure has never seen the footage.

37. MPD initially approved her request to bring Mr. Alston's father-figure and brother, two legal representatives, and two ministers from her church, among others. However, the night before Ms. Alston was to view the footage, MPD reneged on their agreement, forcing Ms. Alston to choose only three people to bring with her. When Ms. Alston, Mr. Alston's brother, and two attorneys went to view the footage at Internal Affairs, the police treated them without compassion or sympathy.

38. The manipulated footage showed only the following: Mr. Alston turning to face the officers while holding a small object; the sound of gunfire; and then Mr. Alston's body lying on the

ground. There was no discernable audio until the officers' gun shots. The small object was
not discernable.

39. After viewing the manipulated footage, Ms. Alston filed a FOIA request for all BWC footage
involving Mr. Alston's shooting. In October 2019, MPD denied Ms. Alston's request on the
ground that the footage was related to an ongoing investigation. As of filing, Mr. Alston has
been dead for nearly twenty-four months. Neither Mr. Alston nor any of his acquaintances
were ever charged with a crime stemming from Mr. Alston's encounter with Officers X and
Y.

40. On September 26, 2019, MPD denied Ms. Alston's FOIA request. Ms. Alston appealed this
decision, and on January 24, 2020, MPD agreed to release all footage "in redacted form," on
a "rolling basis." To date, Ms. Alston has yet to receive anything. The officers killed Mr.
Alston nearly two years ago; it is unclear what MPD has left to investigate.

41. Ms. Alston continues to advocate publicly and privately for access to the unedited footage.
She testified before the D.C. Council on October 10, 2019 and has met with several city
councilors. As a result of her advocacy, the D.C. Council passed a temporary law on January
16, 2020 to expand MPD's BWC footage release policy.

42. Neither the District of Columbia nor MPD has ever publicly released any version of the BWC
footage or MPD reports regarding Mr. Alston's shooting. Officers X and Y—Mr. Alston's
killers—remain anonymous.

**Effect on Mr. Alston**

43. As a result of being shot twelve to eighteen times, Mr. Alston sustained fatal injuries from
his encounter with Officers X and Y. He succumbed to these injuries after MPD and FEMS
failed to provide life-saving medical attention.

44. Mr. Alston suffered extreme emotional distress when he was pursued by Officers X and Y without apparent cause or provocation. His emotional distress was exacerbated after being shot by Officers X and Y, at which point Mr. Alston believed—correctly—that he would die.

**Effect on Plaintiff**

45. Nearly two years after his killing, Ms. Alston has yet to learn why MPD killed her son.

46. Ms. Alston suffered—and continues to suffer—extreme emotional distress from MPD having killed her son; from being denied access to the BWC footage of her son's encounter with Officers X and Y; from being shown only an unclear and manipulated segment of that footage on one occasion; from reliving her son's death through her tireless advocacy to view and secure public release of the BWC footage; and from never having learned why the officers killed her son.

47. As a result of MPD's conduct, Ms. Alston has been forced to seek treatment through medication and counseling for depression, anxiety, and sleep disturbances.

48. Ms. Alston is forced to relive her son's death every time news and videos documenting police brutality circulate. In the recent weeks following the murders of George Floyd, Breonna Taylor, and many other Black individuals, Ms. Alston has experienced heightened pain and grief both in her public and private life. The protests at home in D.C. and across the world serve as constant and inescapable reminders of her loss.

49. Ms. Alston will suffer trauma and economic costs from her son's killing for the rest of her life. She will continue to incur significant costs treating the depression, anxiety, and sleep disturbances she has experienced as a result of his untimely killing. She and the rest of his family, especially his daughter Lyric, will suffer from the loss of his familial support for years to come.

50. Despite her grief, Ms. Alston continues to seek answers regarding her son's murder. She regularly attends D.C. Council hearings involving MPD, testifies on behalf of more transparency in DC's body worn camera footage policy, and was actively involved in advocacy for and lobbying of the District's emergency law for the release of body-worn camera footage passed in December 2019 and the District's temporary law to expand MPD's BWC footage release policy in January 2020. These efforts, however, have left Ms. Alston no closer to obtaining the truth of her son's murder. Nonetheless, Ms. Alston remains dedicated to her advocacy.  Most recently, on June 6, 2020 she spoke to a crowd of thousands at a protest in Washington, D.C., where she called on Mayor Bowser to release the BWC footage.

### Duties of MPD and Individual Officers

51. MPD is an agency operated and controlled by Defendant District of Columbia.

52. Defendant Officers were at all times relevant to this complaint employed as police officers in MPD by the District of Columbia. In all instances described in this complaint, Defendant Officers acted within the scope of their employment.

53. Upon information and belief, Defendant Officers participated in standard job training given by MPD and were subject to all laws, regulations, and rules governing the conduct of officers in the employ of MPD.

54. Pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution, the Defendants owed Mr. Alston a duty to act prudently and with reasonable care and to otherwise avoid the use of unnecessary, unreasonable, excessive deadly force.

*MPD's Duties Under 6A DCMR 207*

55.   Defendants owed Mr. Alston a duty of reasonable care to use only the minimal amount of force necessary to apprehend him. Under this duty of care, Defendants were to resort to using firearms to effect apprehension only if the officers: exhausted all other reasonable alternative means of doing so; were seeking to arrest Mr. Alston for a felony they reasonably believed could result in death or serious bodily injury; and would not endanger the lives of others in using their firearms.

56.   Defendants owed Mr. Alston a duty to refrain from using their firearms except for the purposes of defending against an attack they had reasonable cause to believe could result in their death or serious bodily injury.

## COUNT I: VIOLATION OF FOURTH AMENDMENT RIGHTS, 42 U.S.C. § 1983

57.   Plaintiff adopts and incorporates by reference paragraphs 1 through 56 above as if fully set forth herein.

58.   Defendant Officers X and Y acted in reckless and conscious disregard for Mr. Alston's Fourth Amendment right to be free from unreasonable seizures, giving rise to a claim under 42 U.S.C. § 1983.

59.   Defendant the District of Columbia failed to adequately train, supervise, and oversee its officers. This, combined with its further failure to enforce its own policy guidelines, led to a custom and practice of widespread and illegal excessive use of deadly force by MPD officers. Moreover, the District knew or should have known that MPD officers commonly use excessive deadly force but failed to address these widespread violations of individuals' Fourth Amendment rights. These failures give rise to a further claim under 42 U.S.C. § 1983.

60. On June 12, 2018, with no apparent basis or good cause, Officers X and Y chased Mr. Alston after approaching him while he spoke with a group of acquaintances in a residential area of Ward 8.

61. Shortly after giving chase, Mr. Alston turned around to face the officers. Officers X and Y— ignoring the risk to other residents of Ward 8—then fired between twelve and eighteen shots at Mr. Alston in broad daylight.

62. The manipulated segment of BWC footage shows Mr. Alston with an unidentified object in one of his hands before Defendant Officers fired upon him. MPD claims this object was a firearm and that Mr. Alston first fired at the officers. The edited BWC footage does not clearly support either claim.

63. Witnesses at the scene reported that Mr. Alston did not have a gun at the time and thus did not fire at the officers.

64. Mr. Alston's body remained on the ground for hours after his death. During that time, MPD officers allegedly recovered a gun and ammunition in bushes yards away from Mr. Alston's body. As seen in video footage posted to social media on the same day, MPD officers moved Mr. Alston's body closer to the bushes from which they produced the firearm.

65. Defendant Officers' conduct was unwarranted, unjustified, and constituted an unconstitutional excessive use of deadly force.

### Liability of Officers X and Y

66. Officers X and Y either intentionally or with reckless disregard violated Mr. Alston's clearly established Fourth Amendment rights by using deadly force in shooting him twelve to eighteen times on June 12, 2018.

67. A reasonably prudent police officer would or should have known that this conduct violated Mr. Alston's clearly established constitutional rights.

**Liability of Supervisory Officers**

68. Upon information and belief, supervisory Officers Z and A instructed, conspired with, or encouraged Officers X and Y to pursue and subsequently shoot Mr. Alston, whether specifically or as part of a broader instruction to pursue individuals suspected of criminal activity.

69. Since 2015, MPD officers have fatally shot thirteen individuals.[2] Ninety-two percent (12 of 13) of these victims were black.[3] Eighty-five percent (11 of 13) of these individuals were black men.[4] Black people make up merely forty-six percent of D.C.'s population.[5]

70. Upon information and belief, Officers Z and A failed to adequately supervise and train Officers X and Y in proper uses of deadly force, despite previous known and widespread constitutional violations by subordinate officers, including Officers X and Y. Officers Z and A's failure to address these widespread constitutional violations, which increased the risk of subsequent violations, demonstrates their deliberate indifference to these violations.

71. To date, MPD has failed to conclude its investigation as to its officers' shooting of Mr. Alston. Additionally, Officers Z and A have failed to discipline Officers X and Y for their improper use of deadly force.

---

[2] Julie Tate et al., *Fatal Force*, THE WASH. POST, https://www.washingtonpost.com/graphics/investigations/police-shootings-database/ (last updated Mar. 31, 2020).
[3] *Id.*
[4] *Id.*
[5] *Quick Facts—District of Columbia*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/DC (last visited Apr. 6, 2020).

72. Upon information and belief, Officers Z and A's actions and failures directly and proximately caused the violation of Mr. Alston's Fourth Amendment right to be free from the use of excessive deadly force.

73. A reasonably prudent police officer would or should have known that this conduct violated Mr. Alston's clearly established constitutional rights.

### Liability of FEMS

74. FEMS medical responders failed to promptly respond to the incident and failed to provide adequate life-saving medical treatment.

75. A reasonably prudent medical responder would or should have known that failure to respond promptly after an individual has been shot multiple times would result in death.

### Liability of the District of Columbia

76. Upon information and belief, the District—which controls and operates MPD—pursued policies, practices, and customs (referred to collectively as "policies") that directly and proximately caused the violation of Mr. Alston's Fourth Amendment right to be free from the use of excessive deadly force.

77. Upon information and belief, these policies include, but are not limited to:

    a. Failing to adequately train, supervise, oversee, and discipline officers—including Officers X and Y—whom the District knew or should have known used excessive deadly force, and failing to enforce its own policy guidelines. These failures led to a custom and practice of widespread and illegal excessive use of deadly force by MPD officers. The District's failure to sufficiently address these widespread constitutional violations—which increased the risk of subsequent violations—demonstrates its deliberate indifference to these violations.

b.  Employing a police code of silence where officers and supervisors cover up instances of excessive deadly force by fabricating accounts in police reports and internal affairs investigations presented to the media with the intention of falsely exonerating officers from potential civil liability. MPD has not concluded its investigation of Mr. Alston's shooting, has not disciplined any officers involved in the shooting of Mr. Alston, and has failed to conclude the investigation in a timely manner, allowing MPD to withhold necessary information as the statute of limitations tolls.

c.  Falsely claiming that inactive investigations of events for which MPD officers and the District could be civilly liable are ongoing, in order to withhold information to the public until the statute of limitations for those potential claims toll. Ms. Alston's difficulty in obtaining access to the BWC footage of her son's shooting is merely one example of this practice.

d.  Creating and implementing procedures allowing for and promoting the use of excessive deadly force by officers in unwarranted and unjustified circumstances.

e.  Maintaining a practice of disproportionately heavy police presence and enforcement in Ward 8, known by police as a saturation patrol.  Officers X and Y were present as a result of that practice.

f.  Other failures yet to be discovered.

## COUNT II: WRONGFUL DEATH

78. Plaintiff incorporates by reference paragraphs 1 through 77 above as if fully set forth herein.

79. Ms. Alston brings this claim for wrongful death as the special administrator of Mr. Alston's estate. Ms. Alston formally requested to become the legal representative for Mr. Alston's estate on May 27, 2020. Ms. Alston became the special administrator of her son's estate, with

17

the power to commence and maintain or defend suits and other legal proceedings, on June 9, 2020.

80. Plaintiff's claims under common law negligence and assault and battery are actionable under the District's wrongful death statute, D.C. Code § 16-2701.

81. Decedent Mr. Alston was wrongfully killed by Officers X and Y. Officers Z and A failed to prevent the unlawful killing through their supervision of Officers X and Y.

82. As a direct result of the wrongful acts committed by Officers X, Y, Z, and A and the District, Plaintiff incurred burial expenses and the loss of pecuniary support expected to be provided by Mr. Alston.

## COUNT III: SURVIVAL

83. Plaintiff incorporates by reference paragraphs 1 through 82 above as if fully set forth herein.

84. Ms. Alston brings this survival claim as the special administrator of Mr. Alston's estate.

85. Plaintiff's claims under common law negligence and infliction of emotional distress on behalf of Mr. Alston are actionable under the District's survival statute, D.C. Code § 12-101.

86. Mr. Alston suffered extreme emotional distress and died as a direct result of the wrongful and negligent acts committed by Officers X, Y, Z, and A and the District.

## COUNT IV: COMMON LAW ASSAULT AND BATTERY

87. Plaintiff incorporates by reference paragraphs 1 through 86 above as if fully set forth herein.

88. Officers X and Y, in deliberately killing Mr. Alston by shooting him twelve to eighteen times, intentionally and unlawfully attempted and threatened physical harm to Mr. Alston.

89. Officers X and Y, in deliberately killing Mr. Alston by shooting him twelve to eighteen times, intentionally caused harmful bodily contact to Mr. Alston.

90. No reasonably prudent police officer would have believed that Mr. Alston's actions placed Officers X and Y in imminent peril of death or serious bodily harm.

## COUNT V: COMMON LAW INTENTIONAL INFLICTION OF

## EMOTIONAL DISTRESS

91. Plaintiff incorporates by reference paragraphs 1 through 90 above as if fully set forth herein.

### Mr. Alston

92. Officers X and Y, in approaching and pursuing Mr. Alston without apparent cause or provocation, intentionally or recklessly caused Mr. Alston to suffer severe emotional distress.

93. Officers X and Y knew or should have known that pursuing Mr. Alston would cause him to fear for his physical safety. According to the Officers' own account, Mr. Alston fled the Officers. Moreover, several well-publicized instances of MPD officers using excessive deadly force—particularly against young, Black men—have led to widespread fear and mistrust of MPD officers.  Mr. Alston feared for his life.

94. With each shot until the point when he succumbed to his injuries, Mr. Alston was in imminent fear for his life.

### Plaintiff Kenithia Alston

95. The District, through its agents and employees, intentionally or recklessly caused Ms. Alston to suffer severe emotional distress through its gross disregard for Ms. Alston's well-being in the days after her son was killed by MPD.

96. The District's failure to notify Ms. Alston of her son's death and the officers' curt and thoughtless behavior when they finally contacted her was outrageous and indecent.

97. Further, the District, through its agents and employees, intentionally or recklessly caused Ms. Alston to suffer severe emotional distress by refusing to allow her to view the edited BWC

footage of her son's shooting for more than a year or with her loved ones accompanying her. Ms. Alston has never seen an unredacted version of the footage.

98. By denying Ms. Alston's repeated requests, the District forced her to advocate publicly and privately for access to the footage. As a result, Plaintiff has to repeatedly relive her son's shooting and recount her traumatizing interactions with MPD. The experience has been emotionally devastating.

99. When Ms. Alston was finally allowed to see a manipulated version of the BWC footage in August 2019, MPD refused to let her bring Mr. Alston's father and a minister from her church, denying her access to the emotional support she needed to view the video of her son's death.

100. The footage that MPD showed to Ms. Alston in August 2019 was short, manipulated, and unclear. Neither Ms. Alston nor the attorney who accompanied her were given the opportunity to scrutinize the footage or even view it more than once.

101. Since August 2019, neither Ms. Alston nor any member of her family or current legal team has been allowed to view the complete and unedited footage. Ms. Alston has thus been forced to continue her fight for access.

102. As a direct and proximate cause of the District's outrageous conduct, Ms. Alston continues to suffer extreme emotional distress. She has been forced to miss work and to seek treatment for depression, anxiety, and sleep disturbances through costly medication and counseling. Nearly two years after Mr. Alston's death, Ms. Alston still does not know why her son was killed.

## COUNT VI: COMMON LAW NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

103. Plaintiff adopts and incorporates by reference paragraphs 1 through 102 above as if fully set forth herein.

104. Defendant Officers X and Y and the District had a duty to exercise reasonable care toward Mr. Alston.

105. Defendants breached that duty by approaching and pursuing Mr. Alston without apparent justification, causing him to fear for his life.

106. Defendants further breached that duty by shooting Mr. Alston without provocation. Having suffered multiple gunshot wounds, Mr. Alston experienced severe emotional distress from the knowledge that he would die, which was further exacerbated by the fact that medical responders did not arrive promptly.

107. Defendants' negligent conduct directly and proximately caused Mr. Alston to suffer severe emotional distress during his initial encounter with Officers X and Y, throughout the officers' pursuit, and from the time Defendant Officers shot him until his death.

## COUNT VII: COMMON LAW NEGLIGENCE IN SUPERVISING AND RETAINING OFFICERS X AND Y

108. Plaintiff incorporates by reference paragraphs 1 through 107 as if fully set forth herein.

109. At all times relevant to this case, Officers X and Y acted within the scope of their duties as employees of MPD and the District.

110. The District had a duty to properly hire, train, supervise, discipline, and—where necessary— terminate its personnel in order to protect the public against dangers reasonably likely to result from the absence of proper hiring, supervision, and firing.

111. Upon information and belief, Officers X and Y were under the command of Officers Z and A when they approached, pursued, and killed Mr. Alston.

112. Officers Z and A had a duty to properly supervise and control Officers X and Y to protect the public against dangers reasonably likely to result from the absence of proper supervision and control.

113. The District and Officers Z and A knew or should have known of prior instances of dangerous or incompetent behavior by Officers X and Y.

114. The District and Officers Z and A, armed with the above information, breached their duties to the public—including Mr. Alston—by failing to adequately hire, supervise, control, discipline, or terminate Officers X and Y.

115. After nearly two years, MPD has failed to conclude its investigation and failed to discipline any officers for the killing of Mr. Alston. Conveniently, this has allowed MPD to withhold necessary information as the statute of limitations tolls.

116. Defendants' breach of these duties directly and proximately caused Mr. Alston's injuries and death.

## COUNT VIII: COMMON LAW NEGLIGENCE IN TRAINING OFFICERS X AND Y

117. Plaintiff incorporates by reference paragraphs 1 through 116 as if fully set forth herein.

118. At all times relevant to this case, Officers X and Y acted within the scope of their duties as employees of MPD and the District.

119. The District and Officers Z and A had a duty to use reasonable care in training MPD personnel, including but not limited to training, education, evaluation, and corrective action against officers in line with governing federal and local laws and regulations.

120. Defendants the District and Officers Z and A knew or should have known that subordinate officers—including Officers X and Y—commonly used excessive force when interacting with the public, but failed to adequately train, educate, evaluate, and take corrective action against those officers, thereby breaching their duty.

121. The District further breached its duty of care to Mr. Alston by failing to use reasonable care in providing training consistent with local and national standards.

122. Defendants' breach of these duties directly and proximately caused Mr. Alston's injuries and ultimate death.

### COUNT IX: COMMON LAW NEGLIGENCE LEADING TO THE DEATH OF MR. ALSTON

123. Plaintiff incorporates by reference paragraphs 1 through 122 as if fully set forth herein.

124. At all times relevant to this case, Officers X and Y acted within the scope of their duties as employees of MPD and the District.

125. At all times relevant to this case, medical responders acted within the scope of their duties as employees of FEMS and the District.

126. After shooting Mr. Alston, the officers failed to provide first-aid services and failed to promptly relay the urgent need for medical support to FEMS. FEMS medical responders did not arrive on the scene for over an hour; when they did, they simply pronounced Mr. Alston dead.

127. Officers X and Y owed Mr. Alston a duty to exercise reasonable care, including using only the minimum amount of force necessary to pursue and apprehend him, exhausting every other reasonable means of apprehension or defense before resorting to the use of firearms, and calling emergency services immediately after a shooting occurs, as per MPD policy.

128. Officers X and Y approached Mr. Alston without cause and, upon information and belief, failed to identify themselves to Mr. Alston or speak with him prior to pursuing him.

129. Officers X and Y did not attempt to use de-escalation or other reasonable means of apprehension or defense prior to shooting Mr. Alston multiple times.

130. MPD has claimed that Mr. Alston possessed a firearm prior to Officers X and Y killing him. The manipulated footage does not support this claim, and several witnesses on the scene deny that Mr. Alston had a gun at the time.

131. Upon information and belief, Officers X and Y failed to provide first-aid services to Mr. Alston after shooting him.

132. Mr. Alston's body remained on the scene of the shooting for hours after his death. During that time, dozens of officers arrived to push back bystanders. FEMS medical responders did not arrive on the scene until approximately one hour after Officers X and Y shot Mr. Alston, at which time the responders pronounced Mr. Alston dead.

133. Officers X and Y failed to exercise reasonable care and violated the acceptable standard of care in: pursuing Mr. Alston without good cause; mistakenly believing Mr. Alston was armed and thus misperceiving him as a threat; and failing to provide aid to Mr. Alston after shooting him twelve to eighteen times.

134. As a proximate cause of these acts and omissions, Mr. Alston sustained serious bodily injury and endured great pain, suffering, and mental anguish from the time he was unreasonably pursued until his death.

### **COUNT X: RESPONDEAT SUPERIOR**

135. Plaintiff adopts and incorporates by reference paragraphs 1 through 134 above as if fully set forth herein.

136. The District is liable for all common law torts its employees commit in the scope of their employment under the doctrine of respondeat superior.

137. At all times discussed in and relevant to this complaint, the Officers X, Y, Z, and A were employees of MPD and the District.

138. At all times discussed in and relevant to this complaint, Defendant Officers acted within the scope of their employment by MPD and the District.

139. Where any Defendant Officer is found liable to the Plaintiff for Assault, Battery, Negligence, or Infliction of Emotional Distress, the District is also liable to the Plaintiff under the doctrine of respondeat superior for those injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) ENTER JUDGMENT holding the appropriate Defendants jointly and severally liable to plaintiff for compensatory damages, punitive damages and other damages recoverable under D.C. Code §16-2701, D.C. Code §12-101, and the common law of the District of Columbia totaling $100,000,000.00 (one-hundred million dollars);

(b) AWARD Plaintiff her costs and reasonable attorney's fees; and

(c) GRANT such other and further relief as the Court deems just and proper.

Dated: June 10, 2020

Respectfully submitted,

/s/Aderson Francois
Aderson Francois (DC Bar #498544)
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-6721
aderson.francois@georgetown.edu

*Attorney for Plaintiff*